UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KATHLEEN ANDERSON,

    Plaintiff,

  v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

    Defendant.

CASE NO. C08-5734BHS-KLS

REPORT AND RECOMMENDATION

Noted for September 11, 2009

Plaintiff, Kathleen Anderson, has brought this matter for judicial review of the denial of her applications for disability insurance and supplemental security income ("SSI") benefits. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR 4(a)(4) and as authorized by <u>Mathews, Secretary of H.E.W. v. Weber</u>, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and Recommendation for the Court's review.

<u>FACTUAL AND PROCEDURAL HISTORY</u>

Plaintiff currently is 46 years old.[1] Tr. 74. She completed two years of college and has past work experience as a cashier and assistant manager. Tr. 38, 168, 198, 386.

On August 24, 2004, plaintiff filed applications for disability insurance and SSI benefits, alleging

---

[1] Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION
Page - 1

disability as of January 30, 2004, due to scoliosis, arthritis and bone degeneration in her back. Tr. 23, 148, 156, 158, 191-92. Her applications were denied initially and on reconsideration. Tr. 23, 74, 76, 137, 140. A hearing was held before an administrative law judge ("ALJ") on January 9, 2007, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 381-417. On March 8, 2007, the ALJ issued a decision, determining plaintiff to be not disabled, specifically finding her to be capable of performing her past relevant work. Tr. 63-70.

Plaintiff's request for review was granted by the Appeals Council on September 11, 2007, and the matter was remanded for further administrative proceedings. Tr. 57-59. A supplemental hearing was held before the same ALJ on February 20, 2008, at which plaintiff, represented by counsel, appeared and testified, as did a lay witness and a different vocational expert. Tr. 418-59. Also at the hearing, plaintiff amended her alleged onset date of disability to September 1, 2004, Tr. 422-23. On March 27, 2008, the ALJ issued a second decision, again determining plaintiff to be not disabled, finding specifically in relevant part:

(1) at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability;

(2) at step two, plaintiff had "severe" impairments consisting of degenerative disc disease, scoliosis, right hip scelerosis, and obesity;

(3) at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4) after step three but before step four, plaintiff had the residual functional capacity ("RFC") to perform sedentary work with the additional non-exertional limitation that she have the option to change positions between sitting and standing; and

(5) at step four, plaintiff was capable of performing her past relevant work as a payday loan clerk/cashier.

Tr. 23-38. Plaintiff's request for review was denied by the Appeals Council on October 27, 2008, making the ALJ's decision the Commissioner's final decision. Tr. 5; 20 C.F.R. § 404.981, § 416.1481.

On December 9, 2008, plaintiff filed a complaint in this Court seeking review of the ALJ's second decision. (Dkt. #1-#3). The administrative record was filed with the Court on February 19, 2009. (Dkt.

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

REPORT AND RECOMMENDATION
Page - 2

#11). Plaintiff argues the ALJ's decision should be reversed and remanded for an award of benefits or, in the alternative, for further administrative proceedings for the following reasons:

    (a)    the ALJ erred in evaluating the medical evidence in the record;

    (b)    the ALJ erred in assessing plaintiff's credibility;

    (c)    the ALJ erred in evaluating the lay witness evidence in the record; and

    (d)    the ALJ erred in finding plaintiff to be capable of performing her past relevant work.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings. Although plaintiff requests oral argument in this matter, the undersigned finds such argument to be unnecessary here.

## DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.    The ALJ's Evaluation of the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts

REPORT AND RECOMMENDATION
Page - 3

"falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir. 2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

A. Dr. Aflatooni

In late August 2004, Lila Aflatooni, M.D., plaintiff's treating physician, completed a state agency "Disability/Hardship Condition Documentation Request" form, in which she diagnosed plaintiff with back pain, arthritis, degenerative joint disease, and anxiety. Tr. 266. Dr. Aflatooni opined that these conditions

limited plaintiff from performing full-time job search and employment activities on a permanent basis. Id. Dr. Aflatooni, however, could not specifically describe how those activities were limited other than to refer to plaintiff's back pain and anxiety. Id.

In late January 2005, Dr. Aflatooni wrote that she recommended "<u>No</u> <u>Work</u>" for plaintiff, as she had "a diagnosis of back pain and L-s <u>DJD</u>." Tr. 275 (emphasis in original). In late December 2006, Dr. Aflatooni completed a "Medical Questionaire to Determine Physical Capabilities" form, in which she found that plaintiff was able to sit, stand and walk for one hour each, that she must alternate positions on a frequent basis due to back pain, that she was unable to bend, climb or crawl, and that she could lift up to 10 pounds occasionally. Tr. 345-46. In addition, Dr. Aflatooni determined that plaintiff needed complete freedom to rest frequently throughout the day, that she had to lie down or sit on a recliner for a substantial period of time during the day, and that her condition was permanent. Tr. 347.

With respect to Dr. Aflatooni's opinions, the ALJ found in relevant part as follows:

> I have not given full weight to the opinions provided by Dr. Aflatooni because they are contrary to the findings of the orthopedic specialists who examined the claimant and found fewer restrictions in her functioning. In August of 2004, Dr. Aflatooni reported on a [Washington State] DSHS [Department of Health and Human Services] disability request that the claimant was unable to seek or perform full time work. Ex 5F/3. . . . [J]ust 3 months later, Dr. [Melvin] Jackson found on examination (on November 18, 2004) that the claimant was capable of performing the demands of light work, with some personal limitations. *See* Ex 2F. Just 2 months later, on January 19, 2005, Dr. Aflatooni wrote on a prescription pad "Recommended: NO work – she has a diagnosis of back pain and L-S DJD." Ex 5F/2. I give little weight to this recommendation because the mere fact of any diagnosis is insufficient to find disability, as our analysis focuses on functioning, not diagnoses. This is particularly relevant with regard to impairments that cause pain, as pain is subjective, and what renders one person completely incapacitated might not affect another person to any perceptible degree. Dr. Aflatooni's treatment records do not lend much further support, as they contain only reports of the claimant's complaints and limited findings of decreased range of motion. *See* 5F/4, 9F/30. I note that, the few times Dr. Aflatooni tested the claimant's straight leg raise, that test was negative. *See* Ex 5F. I further note that the claimant's range of motion when tested by Dr. Jackson was completely normal. Furthermore, Dr. Jackson provided the specific ranges the claimant was capable of performing on range of motion examination, whereas Dr. Aflatooni merely reported that range of motion was decreased. *See* Ex 5F, 9F.
>
> Dr. Aflatooni provided another assessment in December of 2006, and while this was less conclusory than the foregoing ones, the doctor provided no more support for her assessment than before. . . . I have considered this assessment, but for the reasons that follow, I prefer instead the opinion of Dr. Jackson. First, I note that while the doctor provided a function by function assessment, she provided no more support for her findings than in the conclusory notes above. To support her conclusions, the doctor simply noted "back pain & DJD L-S L2-3 scoliosis R&L." Again, while this indicates the diagnosis [sic] an explanation for restrictions – if any are found – the doctor's statement does not provide support for the very severe restrictions in functioning she

| | |
|---|---|
| 1 | found. The doctor's treatment record also fails to provide such support. Of note, the treatment note of a visit in February of 2006 records the claimant's complaints of increased back pain when "lifting and bending at work." Ex 9F/11. The previous month the claimant also mentioned lifting heavy boxes. Ex 9F/13. On testing, the claimant's range of motion was within normal limits, as was the claimant's gait. Straight leg raise was, once again, negative. Ex 9F/11. Taking the sitting and standing/walking limitations together, with the claimant's ability to perform each of these for just one hour per day, thus leaving 5 or more hours per day in which the claimant presumably [sic] supine. . . . Dr. Jackson found the claimant could sit for 6 hours in an 8-hour workday and could stand for the same. I acknowledge that Dr. Jackson's examination was 2 years before Dr. Aflatooni completed this form, and I acknowledge that the claimant's impairments are degenerative. But the treatment notes provide no support for such a dramatic decrease in functioning in just 2 years. *See* Ex 5F, 9F. Because Dr. Aflatooni provided no explanation for her opinion and because her opinions are contrary to both that doctor's treatment notes and the medical evidence of record as a whole, I give the opinions only limited weight. Again, I prefer the opinions of Dr. Jackson, whose assessment was fully supported by his examination. |

Tr. 36-37.

Plaintiff challenges the validity of the ALJ's findings here. First, plaintiff argues the ALJ erred in stating that he preferred the findings of the "orthopedic specialists," asserting that no orthopedic specialist actually examined here. It does appear that none of the examining physicians in the record is an orthopedic specialist. To the extent the ALJ did rely on this basis for rejecting Dr. Aflatooni's opinions, therefore, he erred. See Benecke v. Barnhart, 379 F.3d 587, 594 n.4 (9th Cir. 2004) (more deference given to opinion of specialist about medical issues related to his or her area of specialty than to those who are not specialists) (citing 20 C.F.R. § 404.1527(d)(5)). Plaintiff complains, though, that the ALJ also erred in relying on the findings and opinions of Dr. Jackson, an examining physician, who saw her once in late November 2004, and who did not review any of her medical records.

As noted above, in general, more weight is given to a treating physician's opinion than to those of an examining physician. Lester, 81 F.3d at 830. On the other hand, also as noted above, an ALJ need not accept the opinion of a treating physician, if it is brief, conclusory, and inadequately supported by clinical findings or the record as a whole. Batson, 359 F.3d at 1195; Thomas, 278 F.3d at 957; Tonapetyan, 242 F.3d at 1149. While Dr. Jackson did only perform one physical examination of plaintiff, that examination was both detailed and thorough. See Tr. 241-47. In contrast, none of the functional opinions provided by Dr. Aflatooni were supported by specific clinical findings indicating the presence of significant limitations either contained in the opinions themselves, or elsewhere in her treatment notes. See Tr. 266, 268, 270-75, 317-19, 325-27, 336-37, 345-48.

REPORT AND RECOMMENDATION
Page - 6

Accordingly, although Dr. Jackson may not have seen plaintiff as often as Dr. Aflatooni, the ALJ is correct in finding the former's opinions to be much better supported than the latter's. Dr. Jackson did not review any of plaintiff's medical records prior to giving his opinions – because there were none available at the time (Tr. 241) – but this fact alone is not sufficient to call into question the reliance the ALJ placed on them. Rather, as just noted, Dr. Jackson's complete physical examination of plaintiff, provided all of the objective medical findings he needed to reach his conclusions. There is no requirement on the part of an examining physician that he or she also conduct such a review.

Plaintiff also argues that contrary to the ALJ's statement that Dr. Aflatooni's treatment notes do not provide any support for the dramatic decrease in functioning during the two years following Dr. Jackson's examination, the record shows her scoliosis advanced significantly from July 2005, to December 2006. See Tr. 294-95, 344. The documentation in the record plaintiff points to here, though, does not necessarily help her. For example, plaintiff notes that a late July 2005 treatment record indicated an increase in the degree of scoliosis in her back. Tr. 294-95. However, the medical source who provided that record also obtained otherwise essentially unremarkable physical examination findings, opined that plaintiff's scoliosis seemed to be stable, and recommended she "stick with conservative treatments" only. Tr. 295. A larger increase in degree of scoliosis found in December 2006, was equally lacking in specific functional limitations noted to have resulted therefrom. See Tr. 344.

As defendant points out, furthermore, Dr. Aflatooni referred to neither of these treatment records in the late December 2006 she completed. See Tr. 345-48. Indeed, as noted by the ALJ, the only evidence she provided in support of the functional limitations she found at the time was to state: "Back pain + DJD L-S L2-3" and "scoliosis R+L." Tr. 348 (emphasis in original). The undersigned thus agrees with the ALJ that while "less conclusory" than her earlier functional opinions, Dr. Aflatooni still "provided no more support for her assessment than before." Tr. 36. In addition, as noted above, the mere fact that Dr. Aflatooni saw plaintiff more times than did Dr. Jackson – not surprising considering the treatment relationship they had – alone is not a sufficient reason for discrediting the latter's findings and opinions, especially given the brief, conclusory and inadequately supported findings of the former.

It is true that Dr. Jackson saw plaintiff one time four years prior to the date of the ALJ's decision, but, again, the objective medical evidence in the record – including Dr. Aflatooni's own treatment notes – fail to show such a decrease in plaintiff's actual functioning to support the severe decline therein she noted

in her late December 2006 opinion, not to mention her other earlier highly restrictive findings. Plaintiff further argues it is significant that Dr. Aflatooni was the only physician of record who offered an opinion on the basis of the December 2006 scoliosis findings noted above. As just discussed, though, the degree of increased scoliosis noted therein alone does support the severe functional limitations found.

Plaintiff also has made no showing that Dr. Jackson would have changed his functional assessment of her, had he also reviewed those particular findings. Similarly, plaintiff has not demonstrated that other objective medical findings indicating that an increase in her scoliosis has occurred over time, provides any support for the kinds of limitations found by Dr. Aflatooni, or that, once more, Dr. Jackson or any of the other medical sources in the record would have concluded that plaintiff suffered from any more restrictions in her functioning than they did. Plaintiff argues as well that there is no evidence Dr. Aflatooni found her disabled merely because of the existence of a diagnosis as noted by the ALJ. But that is the pertinent point here. That is, because Dr. Aflatooni provided little in the way of objective medical support for her findings and opinions, it is impossible to determine the actual basis therefor.

Plaintiff goes on to argue that it is because pain is so subjective that the ALJ should have given her treating physician, who was in a position to observe her over time and offer an opinion about how her pain limits her, more weight. That would be fine, except that nowhere in her functional assessments or progress and treatment notes did Dr. Aflatooni actually indicate – let alone state how – the existence of pain caused any such limitations. See Tr. 266, 268, 270-75, 317-19, 325-27, 336-37, 345-48. That absence here is even more damning with respect to Dr. Aflatooni's credibility, since she was in the best position to provide that support, but failed to do so. It certainly may be true, as plaintiff notes, that the primary function of medical records is to promote communication and record keeping for health care personnel, rather than to provide evidence for a disability determination, and thus that a medical condition need not be mentioned in every report for an ALJ to conclude that a physician's opinion is supported by the record.

On the other hand, neither the ALJ nor the Court can read into plaintiff's medical records objective medical evidence that simply is not there in determining whether or not a claimant is disabled. Lastly, plaintiff argues that if the ALJ was concerned regarding the medical basis for Dr. Aflatooni's opinions, he should have attempted to re-contact her for that purpose. However, the ALJ's duty to further develop the evidence in the record is triggered only when the record "is inadequate to allow for proper evaluation of

REPORT AND RECOMMENDATION
Page - 8

the evidence." Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); see also 20 C.F.R. §§ 404.1512(e)(1); 416.912(e)(1). Here, though, it is not that the record was inadequate for the ALJ to make a disability determination, but rather it did not support Dr. Aflatooni's findings and opinions. The ALJ, accordingly, did not err in his evaluation thereof.

      B.     <u>Dr. Jackson</u>

As discussed above, plaintiff was examined by Melvin Jackson, D.O., in late November 2004, at which time he diagnosed her with thoracal lumbar scoliosis, chronic back and leg pains secondary thereto by self-report, lumbar degenerative joint disease and degenerative disc disease also by self-report, and obesity. Tr. 246. Dr. Jackson further provided an assessment of plaintiff's functional capabilities, which reads in relevant part:

> STANDING AND WALKING: The claimant could be expected to be up and about on her feet to [sic] two hours maximum at one time to a cumulative of about six hours out of a normal eight-hour workday. The claimant could walk 30 minutes twice daily and to [sic] climb one flight of stairs twice daily. . . .
>
> SITTING: She could be expected to be up and about on her feet to [sic] two hours maximum at one time to a cumulative of about six hours out of a normal eight-hour workday and to drive or ride in a vehicle up to [sic] two hours maximum twice daily. She should periodically alternate sitting and standing to relieve low back pain and stiffness. . . .
>
> ASSISTIVE DEVICE: None.
>
> LIFTING AND CARRYING: The claimant could be expected to lift/carry 20 pounds occasionally and/or 10 pounds frequently. . . .
>
> POSTURAL LIMITATIONS: She could be expected to perform squatting, bending, stooping, crouching, kneeling and crawling occasionally. . . .
>
> MANIPULATIVE LIMITATIONS: Her manual dexterity is good. She could be expected to perform reaching, handling, feeling, grasping and fingering activities frequently.
>
> RELEVANT VISUAL, COMMUNICATIVE OR WORK PLACE ENVIRONMENTAL LIMITATIONS: The claimant's vision, hearing and speech are good. She should avoid working on hard surfaces such as concrete, on rough and uneven terrain, and on inclines. . . .

Tr. 246-47.

As discussed above, the ALJ stated that he preferred the opinions and functional assessment of Dr. Jackson to the findings and limitations of Dr. Aflatooni, because the former's were "fully supported" by the examination he conducted in contrast to the latter's. Tr. 37. Also as discussed above, the ALJ assessed

1  plaintiff with the residual functional capacity to perform sedentary work, with the additional non-
2  exertional limitation that she "have the option to change positions between sitting and standing." Tr. 33.
3  Plaintiff argues the ALJ erred in not including as well in his assessment of her RFC, Dr. Jackson's stated
4  limitation that she "should avoid working on hard surfaces such as concrete, on rough and uneven terrain,
5  and on inclines" (Tr. 247), despite, as just noted, having found Dr. Jackson's functional assessment overall
6  to be fully supported.

The undersigned agrees the ALJ erred here. Defendant admits the ALJ erred in omitting from his assessment of plaintiff's residual functional capacity this last limitation of Dr. Jackson's, but argues that it was harmless. An error is harmless, though, only if it is "inconsequential" to the ALJ's "ultimate nondisability determination." Stout v. Commissioner, Social Security Admin., 454 F.3d 1050, 1055 (9th Cir. 2006). It is harmless in this case, defendant asserts, because there is no evidence in the record that plaintiff's past relevant work as a payday loan clerk/cashier involved working on hard surfaces, such as concrete. This is not surprising, however, as the ALJ did not inquire as to whether or not plaintiff's past relevant work involved such surfaces, even though he clearly adopted Dr. Jackson's opinion containing that limitation.

Nor is it clear that Dr. Jackson meant to restrict plaintiff only to concrete surfaces, as opposed to other hard types of surfaces, such as flooring tile or wood, which commonly are used in many businesses. The undersigned simply cannot say that no reasonable ALJ would not find plaintiff capable of returning to her past job as a payday loan clerk/cashier, had the record contained any evidence concerning the type of surface she worked on while performing that job. For this reason, the ALJ's error in failing to include Dr. Jackson's limitation in his RFC assessment was not harmless, and remand to the Commissioner for further administrative proceedings on this issue is thus warranted.

II.     The ALJ's Assessment of Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. Sample, 694 F.2d at 642. The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. Id. at 579. That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is

supported by substantial evidence. Tonapetyan, 242 F.3d at 1148.

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester, 81 F.3d at 834 (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

Here, along with the statements of the lay witnesses in the record discussed in further detail below, the ALJ found "difficult to credit" plaintiff's statement that she could not work due to her "inability to sit or stand/walk for prolonged periods," based on the late December 2004 evaluation report provided by Norma L. Brown, Ph.D. Tr. 34. In that report, Dr. Brown noted plaintiff had "barely moved at all during the 2-hour psychiatric evaluation" performed at the time. Tr. 34, 262 ("She was very still in her chair and there was very little movement during our two hour session."). This was a valid basis upon which to discount plaintiff's credibility. See Smolen, 80 F.3d at 1284 (ALJ may consider ordinary techniques of credibility evaluation, including testimony that appears less than candid). Indeed, it seems that plaintiff has chosen not to challenge the ALJ's stated reason here.

The ALJ also discounted plaintiff's credibility because while she had "attended physical therapy for 6 weeks, beginning in October of 2004, . . . treatment notes showed" she "reported improvement in her symptoms with the therapy," but "claimed in subsequent reports that" it "had worsened her symptoms." Tr. 35. Plaintiff argues this was not a clear and convincing reason for discounting her credibility, noting that the treatment notes in the record are not complete and do not show she consistently reported improvement. The undersigned agrees this stated reason was not proper. In mid-October 2004, plaintiff reported that her low back was "feeling improved." Tr. 235. In late November 2004, she told Dr. Jackson that while

REPORT AND RECOMMENDATION
Page - 11

therapy "helped a little" and she was "feeling stronger in her legs," she had "no relief from her back pain." Tr. 241.

In late December 2004, plaintiff reported that she believed "her condition became worse after" she had gone "to physical therapy for twelve sessions for six weeks." Tr. 257. In late July 2005, she reported again that she found the physical therapy she underwent the previous year had "worsened her back pain." Tr. 294. In mid-December 2006, plaintiff reported a history of physical therapy, "but indicated extended manipulation tended to worsen chronic pain issues." Tr. 351. Thus, the record shows plaintiff consistently reported initial improvement as a result of physical therapy, but that eventually it had worsened her back symptoms. Contrary to the ALJ's finding here, there is no contradiction in plaintiff's reports on this issue. As such, it was improper for the ALJ to discount her credibility based on those reports.

The ALJ next discounted plaintiff's credibility in part for the following reason:

> I also note that the claimant never claimed she was fired from her last job, at Money Tree, for reasons at all connected with her alleged impairments. At the hearing, the claimant said she was fired for "failure to stop teller gossip." She used the same phrase when discussing her firing with Dr. Brown and Dr. [Daniel M.] Neims. *See* Ex 4F/3, 12F/4. The claimant explained that she was fired because her supervisor made up supposed accusations by her co-workers that she had gossiped about them. The claimant went on unemployment for several months, but noted her back was feeling worse and worse. Ultimately, in August of 2004, imaging showed degenerative disc disease of her lumbar spine. The claimant reported that Dr. Aflatooni told her at that point that this condition was disabling.

Tr. 35. Plaintiff argues that although she may not have lost her job at the Money Tree due to her alleged impairments, the ALJ himself found her to be unable to return to her past job as an assistant manager there, and, accordingly, her physical inability to perform that job is not in doubt, and thus does not cast doubt on her credibility. But plaintiff misses the point here. As noted by defendant, while plaintiff alleged an onset date of disability of January 30, 2004, at the first hearing, she also testified at that hearing that she left her job at Money Tree on that date due to other than her medical conditions. See Tr. 387. These statements, at least at the time of the first hearing, are inconsistent with each other regarding the reason as to why plaintiff stopped working, and therefore they do impugn her credibility.

The ALJ discounted plaintiff's credibility in part as well because her allegation that she eventually became unable to work due to the disabling nature of her back impairment in August 2004, is inconsistent with the objective medical evidence in the record, finding more specifically in relevant part:

. . . Treatment records from Dr. Aflatooni from around the time the claimant stopped

> looking for work showed decreased range of motion. *See* 5F. But on consultative
> examination just a few months later, in November of 2004 with Melvin Jackson, DO,
> the claimant's "entire range of motion study was full and normal." Furthermore, the
> claimant was observed to transfer quickly and easily to the examination table, without
> having to turn to her side before lying down or getting back up. She bent over fully to
> untie her shoes and raised her foot to chair height to remove her socks. Ex 2F/3-4. The
> claimant was able to squat, kneel, crawl, and walk on her heels and toes without
> difficulty. She could balance easily on either foot. She had no difficulty bringing one
> heel to the opposite knee. Her gait was normal, without limping, and her stance was
> normal and well balanced. Straight leg raise testing both sitting and supine was
> accomplished to a full 90 degrees without complaint. Strength in all extremities was
> entirely equal and normal, at 5/5. Ex 2F/5. Moreover, the claimant did not even
> complain of tenderness, and no areas of spasm were detected. Ex 2F/5. Dr. Jackson
> detected a thoracal lumbar scoliosis and noted the claimant's right shoulder was higher
> than the left. Ex 2F/5. The doctor then concluded the claimant was able to lift and
> carry 20 pounds occasionally and 10 pounds frequently and to sit for a total of 6 hours
> in an 8-hour workday, for 2 hours at a time. He concluded she was able to stand for a
> total of 6 hours in an 8-hour workday, for 2 hours at a time, and to walk for 30 minutes
> at a time up to twice daily. Ex 2F/6. The doctor felt the claimant was able occasionally
> to squat, bend, stoop, crouch, kneel, and crawl, with no limitation in manipulative,
> visual, communicative, or environmental functions. Ex 2F/7. . . . Because Dr. Jackson
> is a physician and because he is a more objective observer of the claimant's
> functioning, I prefer his conclusions . . .

Tr. 35. This was a proper basis for discounting plaintiff's credibility. <u>See</u> <u>Regennitter v. Commissioner of SSA</u>, 166 F.3d 1294, 1297 (9th Cir. 1998) (determination that claimant's complaints are inconsistent with clinical observations can satisfy clear and convincing requirement). Indeed, plaintiff has not presented any challenge to this stated reason for finding her to be less than fully credible.

Lastly, the ALJ discounted plaintiff's credibility for the following reasons:

> The claimant mentioned at the more recent hearing that she had lost 25 pounds since
> [sic] last hearing. For this she is to be commended. The claimant then claimed that Dr.
> Aflatooni had never suggested that she lose weight or stop smoking (a pack per day).
> She attributed this to the doctor's not caring because the claimant was on state
> assistance. I reject this testimony and find it reflects poorly on the accuracy of the
> claimant's overall testimony. While I find no specific reference to smoking in Dr.
> Aflatooni's treatment records, I find it very difficult to believe the doctor did not
> counsel the claimant about the health hazards posed by cigarette smoking. And the
> claimant's claims that Dr. Aflatooni never counseled her about diet are refuted by a
> treatment note from December of 2005, in which Dr. Aflatooni prescribed a diet
> designed to lower the claimant's lipid levels and scheduled a recheck of the same in 2-3
> months. Ex 9F/15. Clearly the doctor was concerned about the claimant's diet and
> overall health, and the claimant's claims to the contrary shed doubt on the accuracy of
> her reports in general.

Tr. 36. Plaintiff argues the ALJ's unsupported belief that Dr. Aflatooni must have counseled her about not smoking is not a valid reason for discounting her credibility. Plaintiff further argues the diet Dr. Aflatooni prescribed her was related to high cholesterol, and not specifically weight reduction, and therefore also was not a legitimate basis for discounting her credibility. <u>See</u> Tr. 321. The undersigned agrees. Merely

1 because the ALJ finds it incredible plaintiff's treating physician did not counsel about the hazards of
2 smoking, does not at all mean that such counsel in fact was provided. Similarly, the one reference to diet
3 plaintiff notes in the record is highly ambiguous to say the least (see id.), and hardly demonstrates the clear
4 concern the ALJ feels Dr. Aflatooni must have shown here.

5 Nevertheless, as discussed above, the ALJ provided at least three valid reasons for finding plaintiff
6 to be not fully credible in this case. Thus, the fact that some of the other reasons for discounting plaintiff's
7 credibility the ALJ gave were improper, does not render the credibility determination invalid, as long as
8 that determination is supported by substantial evidence in the record overall, as it is here. Tonapetyan, 242
9 F.3d at 1148.

10 III.     The ALJ's Evaluation of the Lay Witness Evidence in the Record

11 Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into
12 account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to
13 each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). In rejecting lay testimony,
14 the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the
15 testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and
16 substantial evidence supports the ALJ's decision. Id. at 512. The ALJ also may "draw inferences logically
17 flowing from the evidence." Sample, 694 F.2d at 642.

18 The record contains a lay witness statement questionaire from plaintiff's boyfriend, Ricky Young,
19 which he completed on December 9, 2006, and in which he sets forth his observations of plaintiff's pain
20 and other physical symptoms and limitations. See Tr. 216-220. The record also contains both a lay witness
21 statement questionaire, dated December 21, 2006, and hearing testimony from plaintiff's friend and former
22 neighbor, Susan Simpson, who related her observations of plaintiff's symptoms and limitations as well. Tr.
23 221-23, 446-51. In regard to those observations, the ALJ found in relevant part as follows:

24 In his witness statement from December of 2006, Mr. Young [sic] the claimant could
sit for only 30 minutes at a time and stand for only 15. Ex. 13E. Ms. Simpson reported
25 the claimant was unable to lift, bend, squat, vacuum, sweep, or carry groceries. She
said the claimant was "totally unable to do the cleaning." She said the claimant could
26 not stand for "any length of time" and that she walked with a "noticeable limp, very
poorly." She said the claimant shifted positions constantly and could sit for "no length
27 of time" and could not drive for "any length of time." Ex 14E.

28 At the hearing, Ms. Simpson testified that the claimant could not sit for long periods of
time. She said the claimant fidgeted and stayed in bed a lot.

> I have considered these claims, but find them difficult to credit, considering the report
> of Dr. Brown, in which the doctor noted the claimant and [sic] barely moved at all
> during the 2-hour psychiatric evaluation. Ex 4F/7. The claims of the claimant's
> witnesses are also not consistent with the objective consultative examination performed
> by Melvin Jackson, DO, who found virtually no limitations . . . For this reason, I have
> carefully considered the statements from the claimant's friend and boyfriend, but
> because they are not consistent with the bulk of the record, I give them limited weight
> in my analysis. . . .

Tr. 34.

Plaintiff argues the ALJ erred in rejecting the above lay witness evidence for these reasons, in light of the fact that Dr. Brown's observation and Dr. Jackson's findings were both made in late 2004, two years prior to when the two lay witness questionaires were completed. As discussed above, however, there is no objective medical evidence in the record to show that plaintiff suffered such a decrease in her functioning during that two-year period to call into question either the observation made by Dr. Brown or the physical findings obtained by Dr. Jackson. Accordingly, the undersigned finds the ALJ provided germane reasons for discounting the lay witness evidence, and thus committed no error here.

IV.  The ALJ's Step Four Analysis

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2. A claimant's residual functional capacity assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id. It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id. However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id. Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id. In assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7. Plaintiff has the burden at step four, however, to show she is unable to return to her past relevant work. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

In this case, the ALJ found plaintiff had the residual functional capacity to:

REPORT AND RECOMMENDATION
Page - 15

> [L]ift and/or carry no more than 10 pounds, to sit about 6 hours in an 8-hour workday, and to stand and/or walk at least 2 hours in an 8-hour workday, with no limitations with regard to pushing or pulling the above amount. She must have the option to change positions between sitting and standing.

Tr. 33. At the second hearing, the ALJ asked the vocational expert whether a hypothetical individual who had the same age and education as plaintiff, and who could "perform at a full range of sedentary" work, with the "potential need for a sit and stand option," would be precluded from performing plaintiff's past relevant work as a payday loan clerk/cashier. Tr. 456. In response to that hypothetical question, the vocational expert testified that such an individual would not be precluded from doing so. Id. Based on the vocational expert's testimony, the ALJ found plaintiff capable of performing that job. Tr. 37-38.

Citing to SSR 96-9p, 1996 WL 374185, plaintiff argues the ALJ erred in so finding, because no determination was made as to how frequently the hypothetical individual presented to the vocational expert would need to alternate between sitting and standing. Defendant correctly notes that SSR 96-9p applies to determinations made at step five, rather than step four, of the sequential disability evaluation process. See id. As pointed out by plaintiff, however, a claimant's RFC is assessed only "one time, after concluding" that the claimant's "impairment(s) is 'severe' but does not meet or equal" a listed impairment at step three of the disability evaluation process. AR 00-4(2), 2000 WL 1460367 *2. While this ruling is limited only to those claimants who reside in Connecticut, New York or Vermont (see id.), there does not appear to be anything in either the Commissioner's rules or elsewhere in the relevant case or statutory law indicating that the RFC assessment is made other than between steps three and four. Indeed, the undersigned has seen no case in which more than one such assessment is made by the ALJ.

The undersigned further agrees with plaintiff that the sit/stand option the ALJ included in his RFC assessment and the hypothetical question he posed to the vocational expert was insufficiently specific as to the frequency thereof. The ALJ found plaintiff to be capable of performing her past relevant work as it is generally performed in the national economy. Tr. 38. At step four of the sequential disability evaluation process, the Commissioner relies primarily on the Dictionary of Occupational Titles ("DOT") "about the requirements of work in the national economy." SSR 00-4p, 2000 WL 1898704 *2. As noted by plaintiff, the vocational expert testified that the job of payday loan clerk/cashier was sedentary. Tr. 455. The DOT also describes that job as being sedentary. DOT 211.462-026.

The term "sedentary work" is defined by the DOT as involving "sitting most of the time, but may

involve walking or standing for brief periods of time." Id. The Commissioner's regulations defines such work as often necessitating "a certain amount of walking and standing" to carry out job duties. 20 C.F.R. § 404.1567(a); 20 C.F.R. § 416.967(a). Under both the DOT and the Commissioner's regulations, "[j]obs are sedentary if walking and standing are required only occasionally," which means "up to 1/3 of the time." Id. Given that the ALJ did not specify the frequency with which plaintiff would have to alternate between sitting and standing, it is not clear this limitation would allow plaintiff to perform a job which is generally performed at the sedentary level.

In addition, as noted by plaintiff, the ALJ may rely on vocational expert testimony that "contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation." Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995). The ALJ has the affirmative responsibility to ask the vocational expert about possible conflicts between her testimony and information in the DOT. Haddock v. Apfel, 196 F.3d 1084, 1091 (10th Cir. 1999); SSR 00-4p, 2000 WL 1898704. Before relying on evidence obtained from a vocational expert to support a finding of not disabled, therefore, the ALJ is required to "elicit a reasonable explanation for any discrepancy" with the DOT. Haddock, 196 F.3d at 1087; SSR 00-4p, 2000 WL 189704 *1. The ALJ also must explain in his or her decision how the discrepancy or conflict was resolved. SSR 00-4p, 2000 WL 189704 *4. The ALJ erred by not eliciting a reasonable explanation from the vocational expert for the above-discussed discrepancy with the DOT.

V. This Matter Should Be Remanded for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292. Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001). Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a

> determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because issues still remain with respect to the limitation Dr. Jackson found regarding plaintiff's ability to walk on hard surfaces, plaintiff's physical residual functional capacity and her ability to perform her past relevant work, this matter should be remanded to the Commissioner for further administrative proceedings. If, on remand, it is determined that plaintiff is not able to perform her past relevant work, than the Commissioner shall make a determination at step five of the sequential disability evaluation process as to whether she is capable of performing other work existing in significant numbers in the national economy.

## CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **September 11, 2009**, as noted in the caption.

DATED this 20th day of August, 2009.

Karen L. Strombom
United States Magistrate Judge